IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| NATHAN WELLER,<br><br>            Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>            Defendant. | CASE NO. 5:22-cv-935<br><br>DISTRICT JUDGE<br>SOLOMON OLIVER, JR<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Plaintiff Nathan Weller filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In July 2019, Weller filed an application for Disability Insurance Benefits alleging a disability onset date of November 5, 2018,[1] and claiming he was disabled due to depression and anxiety. Tr. 147, 179. The Social Security

---

[1]      "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

Administration denied Weller's application and his motion for reconsideration. Tr. 84, 97. Weller then requested a hearing before an Administrative Law Judge (ALJ). Tr. 105.

In July 2020, an ALJ held a hearing. Weller and a vocational expert testified. Tr. 29–72. In February 2021, the ALJ issued a written decision finding that Weller was not disabled. Tr. 11–30. The ALJ's decision became final on April 6, 2022, when the Social Security Appeals Council declined further review. Tr. 1-3; *see* 20 C.F.R. § 404.981.

Weller filed this action on June 3, 2022. Doc. 1. He asserts the following assignment of error:

> Whether the administrative law judge property evaluated plaintiff's allegations pursuant to SSR 16-3p.

Doc. 9, at 1.

**Evidence**

*1.    Personal and vocational evidence*

Weller was born in 1985 and was 33 years old on the alleged disability onset date. Tr. 28. He completed high school and attended college for almost 2 years. Tr. 42. He used to work as a candy cook, robot operator, stock clerk, and fast-food store manager. Tr. 65.

2

2.    *Medical evidence*[2]

In November 2017, Weller had a behavioral health initial assessment at CommQuest. Tr. 233. Weller stated that he had depression caused by diabetes. Tr. 234. His symptoms were depressed mood, diminished ability to think or concentrate, feeling hopeless, and decreased motivation. Tr. 234. He had anxiety, which caused irritability and restlessness, and panic, which caused shortness of breath. Tr. 234. Weller stated that he started taking mental health medication in 2011, had tried several medications, and was currently taking Lexapro. Tr. 234, 240. He was diagnosed with diabetes when he was 12 years old and on an insulin pump for 18 years. Tr. 240. The evaluator assessed Weller with "mood disorder [due to] physical cond[ition]" with major depressive-like episodes and "uncomplicated" alcohol and cannabis dependence. Tr. 240.

In February 2018, Weller saw Certified Nurse Practitioner Marissa Ragon at CommQuest for a psychiatric evaluation for his depression and anxiety. Tr. 253. Weller stated that when he was younger, a doctor touched him inappropriately during an exam, an event that Weller thought about on a daily basis. Tr. 253. Weller's depressive symptoms included decreased motivation, social isolation, fatigue, feeling helpless, and insomnia. Tr. 253. Weller used marijuana to help him sleep. Tr. 253. He stated that he wanted to try lifestyle changes like diet, exercise, and counseling before having his

---

[2]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

3

medication adjusted. Tr. 253. Weller was taking Lexapro, which was "somewhat helpful"—it alleviated his anxiety but not depression. Tr. 254. He worked full time at a candy company. Tr. 254. Ragon's exam findings showed that Weller was dressed appropriately, casually groomed, made good eye contact, and had normal speech and logical thoughts. Tr. 255.

Weller returned to Ragon in April 2018 and reported that soon he would be laid off from his job until July 2018. Tr. 293. Weller stated that his anxiety was more intense than his depression. Tr. 293. Upon exam, Weller was dressed appropriately and had good eye contact, normal speech, and logical thoughts. Tr. 293. He had a good fund of knowledge and good memory, insight, judgment, and concentration. Tr. 293–94. His mood was anxious. Tr. 293. Weller requested counseling and medication for his anxiety, and Ragon prescribed Buspar. Tr. 293.

In May 2018, Weller saw Ragon for a follow-up. Tr. 260. Weller said he was feeling less anxious and was more active, "spending more time at his parent's home." Tr. 260. His exam findings were unremarkable. Tr. 261. Ragon added generalized anxiety disorder to Weller's diagnoses. Tr. 262.

In early October 2018, Weller saw Ragon for a follow up and reported feeling "anxious and depressed (mild-moderate)." Tr. 264. His "sleep was broken" and he felt irritable. Tr. 264. Weller stated that his medications were not effective and "they just make [me] yawn." Tr. 264. Weller discussed making dietary adjustments and starting an exercise routine; during that "transition,"

he wanted to be off work for at least 4 weeks. Tr. 264. Ragon wrote that if Weller "decides to pursue [a] leave of absence from work, [she] would complete [the paperwork]." Tr. 264. Ragon commented that Weller understood that mental health was the primary reason for his absence from work, and diabetes was secondary. Tr. 264. Weller's exam findings were the same as his prior visit except that he had a depressed mood and congruent affect. Tr. 265.

Later that month, Weller went to the doctor for a lump on his abdomen. Tr. 278. The doctor diagnosed Weller with an epigastric mass and prescribed medication. Tr. 279.

A few days later, Weller saw Ragon for a follow-up. Tr. 268. Weller was tearful and felt overwhelmed and very anxious. Tr. 268. He was worried that his abdominal mass was cancerous. Tr. 268. He reported that his diabetes was getting harder to manage and he struggled to afford his medications and mental health treatment. Tr. 268. "He has maintained full-time work." Tr. 268. Weller felt that he had no purpose in life and his symptoms included depressed mood, diminished interest, significant appetite or weight change, social isolation, diminished ability to think or concentrate, and crying spells. Tr. 268. Weller's exam findings showed that he was tearful with a depressed mood and affect. Tr. 269. Weller had "fair" concentration, good memory, insight, judgment, and eye contact, and normal thoughts and speech. Tr. 269. Ragon adjusted Weller's medications and completed Weller's Family Medical Leave

Act paperwork so Weller could "be off work for 1 month to focus on his diet and exercise routine." Tr. 307.

In late November 2018, Weller saw Ragon for a follow-up. Tr. 308. Weller had been off work for about 2 weeks and didn't plan to return because of his severe depression and anxiety. Tr. 308. He planned to file for disability and to start mental health counseling. Tr. 308. Weller stated that his diabetes was uncontrolled and he had an endocrinology appointment the following month. Tr. 308. Weller was trying to adjust his diet and exercise routine but struggled with energy and motivation. Tr. 308. He reported that his Lamictal "might be helping" and his anti-anxiety medication was effective when he took it—a half a pill when went out in public. Tr. 308. Weller's exam findings were the same as his prior visit. Tr. 309.

In January 2019, Weller saw Certified Nurse Practitioner Denise Hewit at CommQuest for a medication management appointment. Tr. 312. Weller reported depression and feeling overwhelmed, which triggered daily anxiety. Tr. 312. He had panic attacks when around others. Tr. 312. He had tried counseling in the past but didn't feel that it was beneficial. Tr. 312. Weller stated that he walked his dog once a week, which improved his mood. Tr. 312. Weller's exam findings showed a depressed mood, good memory and concentration, and fair insight and judgment. Tr. 313.

6

In February 2019, Weller saw a doctor for his "vein issues" related to the lump on his abdomen. Tr. 276. The doctor diagnosed thrombophlebitis[3] and referred Weller to Dr. Zink for a vascular surgery evaluation. Tr. 277.

In March 2019, Weller saw Hewit for a medication management appointment. Tr. 316. Weller reported that he felt comfortable with his new counselor. Tr. 316. Hewit adjusted Weller's medications. Tr. 316.

A few days later, Weller saw Jill Zink, M.D., for a vascular evaluation. Tr. 357. Dr. Zink wrote that Weller had minimal symptoms from an episode of superficial thrombophlebitis in his abdomen and recommended Weller use heat and non-steroidal anti-inflammatory drugs to treat it. Tr. 358.

The same day, Weller had an endocrinology appointment with a new doctor. Tr. 358. Weller's glycemic control was "not at target," so his medications were adjusted. Tr. 362. The doctor recommended that Weller perform moderate physical activity, such as walking. Tr. 362.

In April 2019, Weller saw Hewit for medication management. Tr. 320. Weller stated that he was irritable. Tr. 320. He "really like[d]" his counselor and counseling was helping. Tr. 320. Weller was exercising—lifting weights and walking outside. Tr. 320. Weller wanted to wean off his anxiety

---

[3]     Thrombophlebitis is an "inflammatory process that causes a blood clot to form and block one or more veins, usually in the legs." *See* https://www.mayoclinic.org/diseases-conditions/thrombophlebitis/symptoms-causes/syc-20354607#:~:text=Thrombophlebitis%20(throm%2Dboe%2Dfluh,vein%20thrombosis%2C%20or%20DVT) (last visited Jan. 11, 2023).

medication, which he only took when he went outside, so Hewit didn't order a refill. Tr. 320, 323.

In June 2019, Weller saw his endocrinologist for a follow-up. Tr. 351. Weller reported lifting weights every other day and counting carbohydrates. Tr. 351. Weller's diabetes was "not at target." Tr. 354. The doctor adjusted Weller's medication and instructed Weller to check his sugar levels 4 times a day. Tr. 354.

In July 2019, Weller saw Hewit for medication management. Tr. 328. Weller reported that his mood was stable. Tr. 328. He was doing yardwork and walked his dog once or twice a week, which improved Weller's mood. Tr. 329. Weller had ruminating thoughts at night and asked about medication to treat it, so Hewit prescribed a trial of Vistaril. Tr. 328, 331.

In September 2019, Weller had a follow-up with his endocrinologist. Tr. 348. Weller reported that he hadn't been eating well. Tr. 348. His medications were adjusted. Tr. 350.

In October 2019, Weller saw Hewit for a follow-up appointment and reported that his mood was stable. Tr. 332. In November 2019, Weller stated that his mood had improved. Tr. 386. Hewit had increased Weller's Lamictal dose at his October appointment and Weller stated that since then, he had less anxiety. Tr. 386. Weller questioned whether he needed an anti-depressant and wanted to "titrate down off Lexapro." Tr. 386. His feet had been hurting, so he hadn't been walking. Tr. 386. He reported that his "blood sugars have been

8

more controlled." Tr. 387. Weller's sleep cycles were off—he was only sleeping for 3–4 hours at a time—and he was open to trying Trazodone to help. Tr. 386. Weller used marijuana with friends on weekends. Tr. 386. Weller's counseling had been helpful and he had "initiated closing counseling services at this time." Tr. 387.

In early January 2020, Weller saw Hewit for medication management and had mild to moderate depression due to medical concerns. Tr. 399. Weller explained that he exercised more and was spending time in a sauna, but the increased exercise caused "medical complications." Tr. 399. He planned to find a new primary care physician. Tr. 399. Weller reported "mild anxiety as he is staying at home." Tr. 399. Exercise and using trazodone helped him sleep. Tr. 399. Hewit continued Weller's Lamictal and Trazodone. Tr. 400.

About a week later, Weller followed up with his endocrinologist. Tr. 344. Weller's diabetes was "not at target" and the doctor adjusted Weller's medications. Tr. 347. The doctor's impression was that Weller had uncontrolled diabetes with hyperglycemia, obesity, and insulin resistance. Tr. 347.

In late January 2020, Weller saw a new doctor, Stephen Scheufler, M.D. Tr. 413. Weller reported depression and the following symptoms, which he experienced nearly every day: little interest or pleasure in doing things, feeling down and hopeless, trouble falling and staying asleep, trouble concentrating, and suicidal thoughts. Tr. 413. Weller reported that, several days a week, he was tired or had little energy and had a poor appetite or overate. Tr. 413.

9

Weller also complained of "poor circulation as he had … tinglin[g] in the extremities for years" and "some issues with coldness to the extremities." Tr. 413. Upon exam, Weller had decreased sensation to light touch and vibration. Tr. 414. Dr. Scheufler assessed Weller with "polyneuropathy in diabetes" and prescribed gabapentin. Tr. 415.

In March 2020, Weller saw Hewit for a follow-up. Tr. 403. Weller said that he started taking Lexapro again because he experienced increased depression when he stopped taking it shortly after his January appointment. Tr. 403. Weller reported "decreased irrational thoughts." Tr. 403. He had flashbacks about his childhood trauma and described how that event effected his ability to trust others. Tr. 403. Weller stated that he had decreased energy and rated the severity of his depression a 7 out of 10. Tr. 403. He managed his anxiety by walking his dogs. Tr. 403. Hewit continued Weller's medications. Tr. 404.

In June 2020, Weller followed up with Hewit. Tr. 408. Weller had been out of Lexapro and his depression had increased to a "moderate" level. Tr. 408. Running out of Lexapro had also caused his anxiety to increase—"Lexapro has been helpful." Tr. 408. Weller continued to monitor his glucose levels and walk his dogs. Tr. 408.

In October 2020, Weller saw Dr. Scheufler for foot pain, which Weller described as a "burning numbness." Tr. 417. Weller stated that he stopped taking the gabapentin because it wasn't helpful. Tr. 417. Dr. Scheufler

prescribed gabapentin again. Tr. 418. As for Weller's diabetes, Weller reported that his most recent HbA1C test[4] was high, he was unable to work due to his mood disorder, and he couldn't afford healthy foods. Tr. 418. Dr. Scheufler wrote that Weller's depressive disorder seemed to be a "ba[r]rier in his care" and encouraged Weller to speak to his psychiatrist about that. Tr. 419. Dr. Scheufler ordered an EMG and nerve conduction study, which showed "a mild sensory and motor polyneuropathy of the distal lower limbs with axonal and demyelinating features."[5] Tr. 427.

In November 2020, Weller saw Hewit for a follow up. Tr. 438. Weller reported increased depression and weekly crying spells. Tr. 438. He was awaiting the outcome of his disability case, which contributed to his depression. Tr. 438. He was only walking his dog once a week. Tr. 438. Hewit wrote that Weller "was tearful as his finances are tight." Tr. 438. Weller had moderate anxiety and was agreeable to trying a new medication for depression. Tr. 438.

---

[4]  An HbA1c or A1c test shows a person's average blood sugar level for the past 2–3 months. *See* https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643 (last visited Jan. 11, 2023).

[5]  Polyneuropathy is nerve damage that causes weakness, numbness, and pain, usually in the hands and feet. It is most commonly caused by diabetes. *See* https://www.mayoclinic.org/diseases-conditions/peripheral-neuropathy/symptoms-causes/syc-20352061 (last visited Jan. 11, 2023).

3.    *State agency opinions*[6]

*Physical*: In September 2019, Sai Nimmagadda, M.D., reviewed Weller's record and found that Weller did not have a severe physical impairment. Tr. 76. In January 2020, Dimitri Teague, M.D., reviewed Weller's record and agreed with Dr. Nimmagadda's findings. Tr. 89.

*Mental*: In September 2019, Larry Kravitz, Psy.D., reviewed Weller's record and assessed his mental residual functional capacity (RFC).[7] Dr. Kravitz found that Weller could perform simple, routine tasks. Tr. 80. Weller could interact appropriately on a superficial level but would do better in a job that did not require significant amounts social interaction. Tr. 80. He could "deal with a work setting with routine demands, but would likely have difficulty with more than ordinary work expectations." Tr. 80. In December 2019, Karla Delcour, Ph.D., reviewed Weller's record and agreed with Dr. Kravitz's findings. Tr. 93–94.

---

[6]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[7]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

####    4.    *Hearing testimony*

Weller testified at the telephonic administrative hearing held in July 2020. He was not represented by counsel. Tr. 31. The ALJ went over Weller's right to representation, which Weller had also received in the mail, and advised Weller that he could postpone the hearing to seek representation. Tr. 34–35, 127–28. Weller stated that he wished to proceed without representation. Tr. 35.

Weller stated that he lives by himself. Tr. 41. He has a driver's license and is able to drive. Tr. 42. When asked why he stopped working at his most recent job making candy at a factory, Weller stated that his depression and anxiety became overwhelming because of the way his diabetes affected his body. Tr. 45. He has pain in his legs and develops blood clots, which "they can't do anything about." Tr. 45. He has neuropathy in his feet. Tr. 51–52. He lost control of his bowels on 2 occasions. Tr. 52. He "can't interact with or be around people in a positive manner" because of anxiety and depression. Tr. 51. He has been to multiple counselors, but "they don't help in a positive manner." Tr. 52.

Weller explained that when he was 12 years old, he was molested by the doctor who diagnosed him with diabetes. Tr. 52. That event, and always being around doctors and having to ask them for help, is the basis for Weller's depression and anxiety. Tr. 52. Weller's symptoms have not improved over the years. Tr. 52. He has taken mental health medication, but the medication that

13

helped the most "still has shortcomings." Tr. 52. He still gets anxiety "very, very bad." Tr. 52.

The ALJ asked Weller to describe the problems and limitations caused by diabetes. Tr. 53. Weller answered that his ability to stand on his feet for long periods of time was limited. Tr. 53. That problem is "very random sometimes" and "will kinda spike just out of nowhere." Tr. 53. He also "ha[s] it in [his] fingertips" from biting his fingernails because he is anxious all the time. Tr. 53. "[T]hat really hinders [his] grasp[] of some things." Tr. 53. As for treatment, Weller was prescribed gabapentin for his neuropathy but he stopped taking it because it "didn't really work" and made him feel dizzy. Tr. 53. He didn't ask the doctor about alternative treatments. Tr. 54. When asked why, Weller explained that he fears doctors and feels like they don't listen to him. Tr. 54.

Weller sees an endocrinologist to monitor his diabetes and prescribe medication. Tr. 54. Weller spoke to his endocrinologist about his hand and foot problems, but the doctor told Weller to see a family physician. Tr. 55. So Weller started seeing a new family doctor, and that's who prescribed gabapentin. Tr. 54–55.

As for limitations his mental health issues cause, Weller stated that, in addition to difficulty interacting with people, he experiences a lack of motivation. Tr. 56. Lack of motivation causes problems performing typical housework—washing dishes, walking his dog on a regular basis, and "just

14

cleaning around the house." Tr. 56. For treatment, he takes anxiety medication, which "has worked best for me." Tr. 57. But it seems to help more with depression, rather than anxiety. Tr. 57. He controls his anxiety by prevention—"[I]f I have gotten a panic attack or have been put in a situation somewhere that gives me the anxiety, I completely avoid the situation." Tr. 57. When asked if he has spoken to his doctors about something for his panic attacks, Weller stated that his provider prescribed lamotrigine. Tr. 58. "It helps I guess to like go out in public and whatnot." Tr. 58. But "avoidance is the biggest help." Tr. 58. He normally grocery shops early in the morning or late at night because there are fewer people around. Tr. 58.

Weller stopped seeing his counselor because he felt that counseling didn't work. Tr. 58. Weller is a very "independent, alone" kind of person and "the talking is a problem." Tr. 58.

Weller is able to take care of his dog. Tr. 59. He used to walk his dog once or twice a week for 15–20 minutes, but he hasn't done so recently. Tr. 60. The last time he walked his dog was about a month prior to the hearing. Tr. 60. Weller also performs his own personal care tasks and household chores. Tr. 60–61. When asked how he spends his days, Weller stated that he tries to exercise as much as he can, "which is not very often." Tr. 61. He lifts weights and "simple things like that." Tr. 62. He reads, watches movies, and tries to do work around the house. Tr. 61. He has been trying to spend more time outside in the summer, which helps him mentally. Tr. 61.

15

When asked to describe what he did on a typical day, such as the day before the hearing, Weller stated that he woke up, listened to the radio, and exercised for about 20 minutes. Tr. 62. He lay in the sun for about 2.5 hours "to get some vitamin D." Tr. 62. Then he watched a television show on Netflix "and that was about it." Tr. 62.

The ALJ discussed with the vocational expert Weller's past relevant work as a candy cook, assembly line robot operator, stock clerk, fast food manager, and short order cook. Tr. 65. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Weller could perform Weller's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 66. The vocational expert answered that such an individual could not perform Weller's past work but could perform the following jobs: marker, garment sorter, and checker. Tr. 67–69.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2024.

2. The claimant has not engaged in substantial gainful activity since November 5, 2018, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: type I diabetes mellitus with polyneuropathy, obesity, and depressive[] mood, and anxiety disorders with alcohol and cannabis dependence (20 CFR 404.1520(c)).

16

4.   The claimant does not have an impairment or a combination of impairments that meets or medically equals the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), with the following limitations: The claimant can never climb ladders, ropes, or scaffolds, and he must avoid all exposure to extraordinary hazards such as unprotected heights. The claimant can perform simple routine tasks, and interact occasionally with others, but he can have no responsibility for sales, arbitration, negotiation, confrontation, conflict resolution, or the safety or welfare of others.

6.   The claimant is unable to perform past relevant work (20 CFR 404.1565).

7.   The claimant was born [i]n January 1985. Therefore, he was 33 years old and defined as a younger individual on the alleged disability onset date (20 CFR 404.1563).

8.   The claimant has at least a high school education (20 CFR 404.1564).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from November 5, 2018, through the date of this decision (20 CFR 404.1520(g)).

Tr. 17–25.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.  Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.  Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

Weller argues that the ALJ didn't properly evaluate Weller's complaints of symptoms. Doc. 9, at 13. To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v.*

20

*Berryhill*, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)).

Here, the ALJ found that the intensity, persistence, and limiting effects of Weller's alleged symptoms lacked "objective and/or overall record support." Tr. 20. The ALJ began by writing that Weller was then-currently 35 years old and was diagnosed with diabetes when he was 12. Tr. 20. Despite his diabetes and subsequent diagnoses of anxiety, depression, and daily alcohol and marijuana use, Weller maintained regular, full-time work until 2018. Tr. 20. In late 2017, while "living and maintaining himself independently," Weller sought more specialized psychiatric treatment because he believed that his mental health medication, prescribed by his primary care physician, was "only 'somewhat helpful.'" Tr. 20. At an initial psychiatric intake exam, Weller had good memory, insight, judgment, and concentration. Tr. 20. The evaluator assessed Weller with a Global Assessment of Functioning[8] score of 62, which

---

[8]      Global Assessment of Functioning (GAF) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000, at 34. A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id*. In 2013, the Fifth Edition of the Diagnostic & Statistical Manual of Mental Health Disorders was published and did not include the GAF. *See* American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013, at 16.

is "generally mild to no more than moderate affective distress/dysfunction." Tr. 20. A mental health provider adjusted Weller's medications and Weller reported that his symptoms improved. Tr. 20.

The ALJ remarked that Weller asked his mental health provider, Nurse Ragon, to complete paperwork for Weller so that he could stop working for 4 weeks and use that time to "transition" to a better dietary and exercise routine. Tr. 20–21. Ragon completed Weller's off-work paperwork, even though Weller did not have increased clinical findings and maintained a GAF score of 62. Tr. 21. During Weller's planned work absence, Weller didn't follow up with his endocrinologist as directed. Tr. 21. Weller expressed concern about a recent diagnosis of "'an episode of superficial thrombophlebitis in one of the varicosities in his abdomen,' with 'really…minimal symptoms,'" despite his doctor's assurances that he "really [had] no symptoms" and further intervention wasn't necessary. Tr. 21. Weller reported that his psychiatric medications helped and he only took his anxiety medication when he went out in public—in contrast, the ALJ noted, to Weller's statements that his depression was severe and persistent and his anxiety was moderate to severe. Tr. 21.

The ALJ remarked that in January 2019, Weller said that he did "not feel he [could] return to work," yet he maintained a Global Assessment of Functioning score of 62. Tr. 21–22. In March, Weller reported improvement. Tr. 22. By summer, Weller was visiting a recreation center every other day,

had a stable mood and good sleep with no adverse medication side effects, and continued to report that walking his dog improved his mood. Tr. 22. The ALJ contrasted those facts with the allegations in Weller's July 2019 function report, in which Weller stated that his depression prevented him from "doing things" and anxiety made him repulsed by society. Tr. 22. The ALJ also observed that Weller's statement that Weller had no friends was belied by his reports in the record that he smoked marijuana "with [a] friend." Tr. 22. And the ALJ wrote that Weller's allegations that he had problems remembering and difficulty concentrating were belied by Weller's objective exam findings, which regularly showed good concentration and memory. Tr. 22.

The ALJ's narration goes on to say that Weller was tearful at an appointment in October 2019 when discussing family dynamics, but he improved the next month and into early 2020. Tr. 22. And while Weller was again tearful towards the end of 2020 when discussing his financial situation, he nevertheless maintained appropriate grooming and hygiene, normal speech, and a cooperative, calm, and talkative presentation. Tr. 22. Finally, the ALJ discussed Weller's physical exam findings of decreased sensation to light touch in Weller's toes, but "EMG/nerve conduction studies … showed only 'mild sensory and motor polyneuropathy' of [Weller's] lower extremities." Tr. 22.

After that narrative, the ALJ highlighted Weller's allegations at the administrative hearing, in which Weller said that diabetes limited his ability to stand, and that the combination of his impairments "have not benefitted

23

from medication or treatment." Tr. 22. The ALJ contrasted that with Weller's reports—at the hearing, in Weller's function report, and in the treatment notes—of the numerous activities that Weller nevertheless performed. Tr. 22. In short, the ALJ considered Weller's statements, information provided by medical sources, and other relevant evidence in the record, including Weller's daily activities, the intensity of Weller's symptoms, precipitating and aggravating factors, and the effectiveness of medication and side effects, which is what SSR 16-3p—the rule Weller cites—requires." *See* SSR 16-3p, 2017 WL 5180304, at *4, 7–8; 20 C.F.R. § 404.1529(c).

Weller first argues that the ALJ doesn't "sufficiently articulate how working and having minimal symptoms a year prior to the alleged onset date makes [Weller's] current allegations not consistent with the evidence." Doc. 9, at 14. But the ALJ explained that Weller sought mental health treatment while he was working full time, prior to his alleged disability onset date; was assessed with mild to moderate symptoms; and then was prescribed medication, which improved his symptoms. Tr. 20. In other words, the fact that Weller's symptoms were mild to moderate while Weller was working full time and then improved with treatment undercuts Weller's allegations of disabling symptoms after Weller stopped working, a point the ALJ "sufficiently articulate[d]."

Weller argues that the ALJ didn't articulate how certain findings undermined Weller's reports of symptoms. Doc. 9, at 14. For example, Weller

asserts, the ALJ referenced Weller's statements that walking the dog improved Weller's mood, without further explanation. *Id*. But the point is that Weller's dog walking was an activity that controlled and improved Weller's symptoms. Tr. 21–22. *See* SSR 16-3p, 2017 WL 5180304, at *6 (the ALJ considers "activities that precipitate or aggravate" the claimant's symptoms). Weller complains that the ALJ didn't discuss "any additional information about length of time improvement lasts, or how much improvement," Doc. 9, at 15, but doesn't identify legal authority mandating that the ALJ discuss that.

Weller complains that the ALJ "left out" items that Weller wrote in his July 2019 function report. Doc. 9, at 15 (listing Weller's statements in Weller's function report that Weller has trouble sleeping due to anxiety, uses an alarm due to memory issues, only cleans monthly, and has problems reading due to concentration issues, getting along with authority figures, and tolerating changes in routine). But the ALJ cited Weller's statements in his function report about memory, concentration, and adapting to changes in routine. Tr. 22 (explaining that despite those allegations, Weller's objective exam findings showed that Weller had good memory and concentration). The ALJ also referenced Weller's statements in his function report that he had trouble sleeping. Tr. 20–21. As to that, the ALJ remarked that in July 2019, the same month Weller completed his function report, Weller said that his sleep was "good" Tr. 21. *See* SSR 16-3p, 2017 WL 5180304, at *10 ("We will review the case record to determine whether there are explanations for inconsistencies in

25

the individual's statements about symptoms and their effects, and whether the evidence of record supports any of the individual's statements at the time he or she made them").

Weller argues that the ALJ didn't "address" Weller's daily activities in violation of Social Security Ruling 16-3p. Doc. 9, at 16–17. But the ALJ discussed Weller's daily activities. Tr. 21–22 (walking the dog, doing yardwork, cooking and cleaning, self-care tasks, using marijuana with a friend, visiting a recreation center and a sauna, exercising, shopping, reading, watching Netflix, lying in the sun). Weller complains that at the administrative hearing, the ALJ didn't ask him "much if anything about his daily activities and the effect of [his] impairment in his everyday life." Doc. 9, at 17. Weller's assertion is belied by the hearing transcript. *See* Tr. 53, 56, 59–62 (the ALJ asking Weller how his impairments limit him, what daily activities he performs, and how he spends a typical day). So, too, is Weller's assertion that the ALJ didn't consider medication side effects, Doc. 9, at 17. *See* Tr. 22 (ALJ stating that Weller reported no "adverse medication side effects").

Weller contends that the ALJ "did not adequately discuss the location, duration, [and] frequency of pain" that Weller experienced in his legs and feet. Doc. 9, at 17. But the ALJ need not discuss all the factors in Social Security Ruling 16-3p. *See Hatcher*, 2019 WL 1382288, at *15. In any event, Weller reported "foot pain" described as "burning numbness" to his doctor in October 2020. Tr. 417. The doctor diagnosed Weller with neuropathy and ordered EMG

26

and nerve conduction studies. Tr. 418. Weller's EMG and nerve conduction studies showed "only mild sensory and motor polyneuropathy," which the ALJ noted. Tr. 22. The ALJ also wrote that Weller's episode of superficial thrombophlebitis caused no or minimal symptoms. Tr. 21. The ALJ's reliance upon that objective evidence when evaluating Weller's reports of symptoms, along with other evidence, was proper. *See* SSR 16-3p, 2017 WL 5180304, at *5 ("objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms"). And although Weller complains that "[h]is hands are also affected by his condition but the ALJ does not discuss these issues," Doc. 9, at 17, Weller, tellingly, also doesn't cite evidence of his alleged hand symptoms.[9] All told, the ALJ's narrative contained specific reasons, was supported by the record, and is sufficiently articulated "so the individual and any subsequent reviewer can assess how the [ALJ] evaluated [Weller's] symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

Weller's final argument has less to do with the ALJ's evaluation of Weller's symptoms and more to do with the ALJ's evaluation of Weller's diabetes. Weller argues that that his diabetes was uncontrolled, exercise "caused complications," and Weller's EMG "was consistent with polyneuropathy with demyelinating features." Doc. 9, at 17. But the ALJ accounted for Weller's diabetes when she limited Weller to performing "light"

---

[9]     Weller's brief only mentions hand symptoms once, in the argument section of the brief and without a record citation.

work.[10] The ALJ rejected the state agency reviewers' opinions that Weller's diabetes caused *no* limitations. Tr. 23. The ALJ wrote that Weller had "some decreased sensation in his lower extremities with some evidence of diminished circulation" caused by his diabetes. Tr. 23. The ALJ found that at the time of Weller's alleged disability onset date, Weller was performing "medium to heavy" level work.[11] Tr. 23. The ALJ reasoned that those facts, as well as Weller's reported activities—"walking, exercise, household, yard, and other activities"—were "consistent with a generally light level of exertion." Tr. 23. So the ALJ restricted Weller to performing *light* work, with no climbing or working at heights to account for Weller's sensory deficits. Tr. 23. Weller has not shown that the ALJ erred when she evaluated his diabetes.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: January 11, 2023

> */s/ James E. Grimes Jr.*
> James E. Grimes Jr.
> U.S. Magistrate Judge

---

[10]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

[11]  "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).